United States District Court

For the Northern District of California

1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                    FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11   JOEL TURTLE, et al.,                    No. C-03-3922 MMC

12            Plaintiffs,                    **ORDER DENYING MOTION TO DISMISS**
       v.
13
     SANCTUARY RECORDS GROUP, INC., et
14   al.,

15            Defendants
     _____/
16

17       Before the Court is the motion, filed April 26, 2005 by counter-defendants Joel Turtle

18   and Matthew Kaufman pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, to

19   dismiss the counterclaim filed by counter-plaintiffs Sanctuary Records Group, Inc., and

20   Sanctuary Records Group Limited (collectively, "Sanctuary").[1]  Sanctuary has filed

21   opposition, to which Turtle and Kaufman have replied.[2]  Having read and considered the

22   _____

23       [1]In its Notice of Motion, Turtle and Kaufman state that the counterclaim was filed by
     "Sanctuary Group LTD and Sanctuary Group PLC."  (See Notice of Motion, filed April 26,
24   2005, at 2:12-13.)  The counterclaim itself, however, identifies the "counter-plaintiffs" as
     "Sanctuary Records Group, Inc." and "Sanctuary Records Group Limited," (see Amended
25   Answer, filed April 15, 2005, at 8:11-15, ¶¶ 53, 54), and those two entities filed opposition
     to the pending motion, identifying themselves as the entities who filed the counterclaim,
26   (see Opp., filed May 13, 2005, at 2:21-23.)  Accordingly, plaintiff's request, made in a letter
     filed on June 20, 2005, for an order granting as unopposed the motion to dismiss, as it
27   pertains to "Sanctuary Group PLC.," is DENIED.

28       [2]Turtle and Kaufman's reply is titled "Objection to Evidence" and was untimely e-filed
     on June 1, 2005.  Moreover, defendants did not offer any evidence.  Further, Turtle and
     Kaufman failed to provide the Court with a chambers copy.  The Court, nonetheless, has

1    papers filed in support of and in opposition to the motion, the Court deems the matter

2    appropriate for decision on the papers and rules as follows.

3                                    **BACKGROUND**

4          On July 19, 1993, Beserkley Audio and Video, Inc. ("Beserkley") and Sanctuary,

5    through a predecessor, entered into an agreement titled Assignment of Catalogue of

6    Master Recordings ("Assignment").[3]  Under the Assignment, Beserkley assigned Sanctuary

7    the rights to certain "Recordings," including the "exclusive right to manufacture and sell

8    records derived from the Recordings."  (See Assignment ¶ 2.1.)  Beserkley also warranted

9    that "the original musical compositions comprising the Recordings will be available to

10   [Sanctuary] for exploitation in the form of Records at no more than the standard rate of

11   license fees prevailing," (see id. ¶ 4.16), and that Sanctuary would have no obligation to

12   third parties except for "the obligation to account to publishers of the original musical

13   compositions in accordance with standard industry practice," (see id. ¶ 4.15).[4]

14         In its counterclaim, Sanctuary alleges Turtle and Kaufman are the "controlling

15   shareholders of Beserkley," (see Counterclaim ¶ 66), and control the publishing rights to

16   the musical compositions comprising the recordings, (see id. ¶ 69).  Sanctuary also alleges

17   that, after it acquired the rights to the recordings, Sanctuary "sought a mechanical license

18   from [Turtle and Kaufman] at the statutory rate on the customary accounting terms," (see

19

_____

20   considered the filing.  For future reference, Turtle and Kaufman are reminded of the

21   following provision in the Court's Standing Orders:  "In all cases that have been assigned to
     the Electronic Case Filing Program, the parties are required to provide for use in chambers

22   one paper copy of each document that is filed electronically.  The paper copy of each such
     document shall be delivered no later than noon on the day after the document is filed

23   electronically.  The paper copy shall be marked 'Chambers Copy' and shall be delivered to
     the Clerk's Office in an envelope clearly marked with the judge's name, case number, and

24   'E-Filing Chambers Copy.'"  Future failures to comply with the Court's Standing Orders may
     result in the imposition of sanctions, including striking e-filed documents that the filing party

25   fails to timely provide to the Court in paper form.

26         [3]The Assignment is attached to Sanctuary's counterclaim as Exhibit 1.

27         [4]The only other exception identified in the Assignment is that Sanctuary would have
     obligations to third parties identified in a "Rights Agreement."  (See id.)  No party has

28   offered the "Rights Agreement" or argued that the contents thereof are relevant to the
     instant motion.

1  id. ¶ 63), but that Turtle and Kaufman "refused to issue to [Sanctuary] licenses to release

2  and distribute the recordings . . . at the statutory rate in accordance with their customary

3  accounting practices," (see id. ¶ 64.)  As a result, Sanctuary alleges, Turtle and Kaufman

4  interfered with the performance of the Assignment, and Sanctuary was "required" to

5  withdraw its distribution of the recordings.  (See id. ¶¶ 71, 72.)

**DISCUSSION**

7      In its counterclaim, Sanctuary alleges one claim, specifically, "Tortious Interference

8  with Contract."  (See id. at 8:11.)  "The elements which a plaintiff must plead to state the

9  cause of action for intentional interference with contractual relations are (1) a valid contract

10 between plaintiff and a third party; (2) defendant's knowledge of this contract;

11 (3) defendant's intentional acts designed to induce a breach or disruption of the contractual

12 relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting

13 damage."  See Quelimane Co. v. Stewart Title Guaranty Co., 19 Cal. 4th 26, 55-57 (1998)

14 (internal quotation and citation omitted).

15     Here, the contract at issue, in relevant part, concerns copyrights in musical works.

16 The Copyright Act provides that a copyright owner has an exclusive right to reproduce the

17 work, see 17 U.S.C. § 106, but further provides for an exception when a person seeks to

18 record certain copyrighted musical works, see 17 U.S.C. § 115(a)(1).  Specifically, the

19 Copyright Act provides:  "When phonorecords of a nondramatic musical work have been

20 distributed to the public in the United States under the authority of the copyright owner, any

21 other person, including those who make phonorecords or digital phonorecord deliveries,

22 may, by complying with the provisions of this section, obtain a compulsory license to make

23 and distribute phonorecords of the work."  See id.  To obtain a compulsory license, a

24 person must give timely notice to the copyright owner before making and distributing

25 phonorecords of the work.  See 17 U.S.C. § 115(b)(1).  Thereafter, the compulsory

26 licensee must pay the copyright owner, on a monthly basis, a statutory royalty rate, see 17

27 U.S.C. §§ 115(b)(2), (c)(5), and must provide the copyright owner with an accounting in the

28 manner set forth in the Code of Federal Regulations, see 17 U.S.C. § 115(c)(5).

1    If a person seeking to distribute copies of a musical work does not obtain a

2    compulsory license, the person must obtain a private license from the copyright holder.

3    See 17 U.S.C. § 115(c)(3)(B); see, e.g., Edward B. Marks Music Corp. v. Foullon, 171 F.

4    2d 905, 908 (2nd Cir. 1949) (holding where parties enter into negotiated license agreement,

5    parties' rights are governed by private agreement and not by Copyright Act).

6    Here, as noted, Sanctuary alleges that Turtle and Kaufman interfered with the

7    Assignment between Sanctuary and Beserkley by refusing to issue a private license to

8    Sanctuary.  In response, Turtle and Kaufman first argue that the Assignment cannot be

9    interpreted as including a promise by Beserkley to negotiate a private license with

10   Sanctuary.  (See Pls.' Mot. at 5:5-8.)  This argument is unavailing because Sanctuary does

11   not allege that Beserkley promised that Beserkley would negotiate a private license; rather,

12   Sanctuary's theory is that Beserkley warranted that Turtle and Kaufman would issue a

13   private license.  (See Counterclaim ¶¶ 59-60, 63-64, 72.)

14   Turtle and Kaufman next argue that because a compulsory license is available under

15   17 U.S.C. § 115, any refusal by Turtle and Kaufman to issue a private license to Sanctuary

16   "did not affect Beserkley's claim that the license was available."  (See Pls.' Mot. at 9:9-11.)

17   In other words, Turtle and Kaufman take the position that the Assignment does not include

18   a warranty by Beserkley that Turtle and Kaufman would issue a private license to

19   Sanctuary, but rather a warranty only that a statutory license would be "available."  (See id.

20   at 9:9-11.)  From the face of the Assignment and the allegations in the counterclaim,

21   however, the Court cannot find that the language of the Assignment is susceptible only to

22   one interpretation.  For example, it cannot be determined at this stage of the proceedings

23   that the obligation to "account . . . in accordance with standard industry practice," (see

24   Assignment ¶ 4.15), is a reference to compulsory licenses.  See 17 U.S.C. § 115 (c)(5).[5]  In

25

26   [5]Indeed, Turtle and Kaufman fail to explain why, if Beserkley warranted only that

27   Sanctuary could obtain a compulsory license, Beserkley referred to Sanctuary's having an
     obligation to account in accordance with standard industry practice.  A person who obtains

28   a compulsory license is obligated to account pursuant to statutorily-mandated procedures,
     not pursuant to industry practices.

4

1   short, the Assignment contains an ambiguity as to whether Beserkley purported to warrant

2   only that a compulsory license was available or that Turtle and Kaufman, as owners of the

3   copyrights in the musical works, would issue a private license at standard rates and in

4   accordance with standard industry accounting practices.  On a motion to dismiss, the Court

5   must resolve the ambiguity in favor of Sanctuary, the non-moving party.  See Falkowski v.

6   Imation Corp., 309 F. 3d 1123, 1132 (9th Cir. 2002), as amended, 320 F. 3d 905 (2003)

7   (holding where issue of whether defendant has contractual duty cannot be resolved from

8   face of contract because of ambiguities therein, contract claims not subject to dismissal)

9       Turtle and Kaufman further argue that because Sanctuary could have obtained a

10  compulsory license, Sanctuary cannot establish it suffered any damage as a result of any

11  refusal to issue a private license.  Sanctuary, however, has alleged it was damaged;

12  specifically, Sanctuary has alleged that Sanctuary was "required to withdraw from

13  distribution" of the Recordings.  (See Counterclaim ¶ 71.)  If the ambiguity in the

14  Assignment were resolved in Sanctuary's favor, the Court cannot say that it is "clear that no

15  relief could be granted under any set of facts that could be proved consistent with the

16  allegations."  See id. (internal quotation and citation omitted).

17      Finally, Turtle and Kaufman argue that, even assuming the Assignment includes a

18  warranty by Beserkley that Turtle and Kaufman would issue a private license, Turtle and

19  Kaufman cannot be liable to Sanctuary because Turtle and Kaufman "were under no duty

20  or obligation to ever negotiate such a deal."  (See Pls.' Mot. at 10:11-12.)  The California

21  Supreme Court, however, has held that, irrespective of whether there is "nothing wrong"

22  with the act claimed to constitute the interference, a claim for intentional interference can

23  be stated, as long as the plaintiff alleges the defendant engaged in the act with the intent to

24  cause a breach of contract or otherwise disrupt a contractual relationship.  See Quelimane,

25  19 Cal. 4th at 55-57 (1998) (holding where plaintiff and third party entered into contract for

26  sale of land and plaintiff alleged that defendant title company, acting with intent to disrupt

27  contract, refused to issue title insurance policy to buyer, plaintiff, as seller, stated claim

28  against title company; rejecting defendant's argument that "there was nothing wrong in its

1  refusal to issue the policy," and finding "[i]ntentionally inducing or causing a breach of an

2  existing contract is [ ] a wrong in and of itself").  Here, in light of Sanctuary's having alleged

3  that Turtle and Kaufman were aware of the Assignment and that they intended, when they

4  refused to issue a private license, to interfere therewith, Turtle and Kaufman are not

5  entitled to dismissal on the ground that a refusal to issue a private license is not, in the

6  abstract, wrongful.

### CONCLUSION

8       For the reasons set forth above, counter-defendants' motion to dismiss is hereby

9  DENIED.

10       **IT IS SO ORDERED.**

12  Dated:  August 16, 2005

MAXINE M. CHESNEY
United States District Judge

6